IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PHILIP A. DOWNEY, ESQ. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FIRST INDEMNITY INSURANCE, FIRST | : | No.: 13-4545 |
| INDEMNITY INSURANCE AGENCY, INC., | : | |
| FIRST INDEMNITY INSURANCE | : | |
| SERVICES, INC., FIRST INDEMNITY | : | |
| INSURANCE GROUP, ANDREW BIGGIO, | : | |
| and JOHN M. BIGGIO, FIRST MERCURY | : | |
| INSURANCE COMPANY, STATE | : | |
| NATIONAL INSURANCE COMPANY, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**DEFENDANTS FIRST INDEMNITY INSURANCE, FIRST INDEMNITY INSURANCE
AGENCY, INC., FIRST INDEMNITY INSURANCE SERVICES, INC., FIRST
INDEMNITY INSURANCE GROUP, ANDREW BIGGIO, AND JOHN M. BIGGIO'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendants First Indemnity Insurance, First Indemnity Insurance Agency, Inc., First

Indemnity Insurance Services, Inc., First Indemnity Insurance Group, Andrew Biggio, and John

M. Biggio (collectively "Movants" or "First Indemnity Defendants") hereby submit this

Memorandum of Law in support of their Motion for Summary Judgment pursuant to Fed. R. Civ.

P. 56.

I.

<u>FACTS</u>

A.    <u>Prior Filings</u>

1.    In support of their Summary Judgment Motion, the Movants hereby rely on the

following documents:

- Defendants First Mercury Insurance Company and State National Insurance Company's Statement of Undisputed Material Facts In Support of its [sic] Motion for Summary Judgment previously filed with the Court on July 31, 2015, Document 73-2; and

- Affidavit of Clinton J. Wolbert, Esq., filed in Support of the Summary Judgment of Defendants, First Indemnity Insurance, First Indemnity Insurance Agency, Inc., First Indemnity Insurance Services, Inc., First Indemnity Insurance Group, Andrew Biggio and John M. Biggio ("Wolbert Affidavit") previously filed with the Court on March 12, 2014, Documents 45-2.

Both of these documents are incorporated by reference into this Statement of Facts and the Court is referred to said documents.

B.    <u>Philip A. Downey's Involvement with the Law Firm Kenney, Lennon & Egan, P.C. ("Kenney Firm")</u>

2.      In 2001, plaintiff attorney Philip A. Downey ("Downey") went into business for himself and began practicing law under the name "Philip A. Downey, Esquire."

3.      At that time, Downey acquired legal malpractice insurance from The Hartford. He was insured by The Hartford until March 2006 when The Hartford nonrenewed the insurance because Downey had sued one of his clients.

4.      After being non-renewed by The Hartford, Downey joined the Kenney Firm as of counsel.  In addition, he continued to maintain his own law practice.  He became insured under the Kenney Firm policy with Philadelphia Insurance Companies.

C.     Downey's Work for Knopick and The Knopick Lawsuit

5.     On July 6, 2009, Nicholas Knopick sued Downey and others in the United States District Court for the Middle District of Pennsylvania.  The claims against Downey were in essence claims for legal malpractice.

6.     The Kenney Firm was not a party to the fee agreement between Nicholas Knopick and Downey.  It was between "Philip A. Downey, Esq." and Nicholas Knopick.

7.     In a letter dated August 7, 2009, First Mercury Insurance Company sent a letter to Downey declining insurance coverage for the Knopick because the wrongful acts occurred before the 10/1/07 retroactive date contained in the applicable malpractice policy.

D.     Philadelphia Insurance Companies

8.     In a letter dated December 31, 2009, Philadelphia Indemnity Insurance Company ("PIIC") sent a letter to Downey declining coverage for the Knopick lawsuit under the policy PIIC issued to the Kenney law firm for the policy period 8/18/2006 to 8/18/2007 ("PIIC Policy").

9.     The "Definitions" section of the PIIC policy provides that "'Insured' whenever used in this policy shall mean … any past or present partner, officer, direction, stockholder, employee or of counsel of the Named Insured, but only as respects professional services rendered on behalf of the Named Insured."

10.     The work Downey performed for Knopick was not performed in Downey's capacity as "of counsel" to the Kenney Firm.  The fee agreement Downey entered into with Knopick mentions nothing about the Kenney Firm.

E.     Expert Report of Ty R. Sagalow

11.     The Movants retained Ty R. Sagalow ("Sagalow") of Innovation Insurance Group, LLC as an expert.

3

1115016v.1

12.     On page 8 of the report, Sagalow summarizes what his report discusses and concludes, stating as follows:

> As more fully discussed in this report, it is my expert opinion that the Retroactive Date endorsement and related exclusion 14.f. of the Policy serves to completely remove coverage for the Underlying Claim.  It is also my expert opinion that First Indemnity performed within industry custom and practice and within the industry's appropriate standard of care in its handling of the retroactive date applicable to the Policy and that, more specifically, First Indemnity did not act outside of industry custom and practice when it obtained a lawyers professional liability insurance policy for the insured with retroactive date which was after he alleged dates of the insured's wrongful acts.  They acted consistent with the industry's appropriate standard of care.

13.     Even if the PIIC Policy had not expired on August 18, 2007, Downey's policy still would have contained a 10/01/07 Retroactive Date.  Sagalow's report states in pertinent part as follows:

> 55. The above statement cannot be over emphasized.  The heart of Mr. Downey's argument is that First Indemnity "should have" given me the same coverage as he enjoyed under the Philadelphia Policy.  What he is missing in this argument is that the Philadelphia Policy would not have covered his alleged Wrongful Act in the Underlying claim either.   Put another way, the "coverage" that the Philadelphia Policy would have afforded for the wrongful Act alleged in Mr. Knopick's claim would be zero.

> 56. LPL policies provide coverage for lawyers acting as "Of Counsel" only for their activities for the firm.  This concept is usually expressed in the definition of "Insured".  In the Philadelphia Policy, definition II, "INSURED", paragraph B states that an Insured shall include:

>> B.  any past or present partner, officer, director, stockholder, employee or of counsel of the NAMED INSURED, *but only as respects professional services rendered on behalf of the NAMED INSURED;*

> 57. Because of Wrongful Act alleged in Underlying Claim [(i.e. the Knopick Lawsuit)] was NOT in the Insured's capacity as Of Counsel to Kenney, Lennon & Egan but rather was made in connection with one of his solo practitioner clients who had nothing to do with Kenney, the Philadelphia Policy is irrelevant.  It is as if it did not exist.

> 58. Accordingly, the <u>real lapse</u> in coverage for Wrongful Acts was not the 9 week period between August 18, 2007 and October 1, 2007 but rather the *18 month* period between March 25, 2006 and October 1, 2007.

4

59.  It is completely unreasonable and against custom and practice to assume that First Indemnity could somehow "fix the lapse" of 18 months not just with State National whose underwriting guidelines prohibited providing prior acts coverage to someone who did not have a current policy but with any insurance carrier in the marketplace.

14.    The "Conclusion" section of the Sagalow Report states as follows:

For the reasons set forth above it is my professional opinion that, based on the custom and practice of the insurance industry as well as the history, intent and actual wording of the Retroactive Date exclusion:

>    1.    The State National Policy at issue contained a Retroactive Date Exclusion endorsement containing a retroactive date applicable to the Underlying Claim of October 1, 2007,

>    2.    Such Retroactive Date Exclusion endorsement serves to completely remove coverage for the Underlying Claim,

>    3.    That the Insured, Phillip A. Downey, was properly advised by First Indemnity of the existence of the Retroactive Date Exclusion,

>    4.    And finally, that First Indemnity adhered to custom and practice and the appropriate industry standard of care with respect to the Retroactive Date and that First Indemnity could not have reasonably been expected to "fix the lapse" in coverage of over 18 months between the covered Wrongful Act date the Insured had on its last applicable LPL insurance policy and the LPL Policy at issue procured for the Insured by First Indemnity.

F.    <u>Downey's Position with Respect to Expert Testimony and the Retroactive Date Endorsement</u>

15.    With respect to the applicability of the Retroactive Date Endorsement, Downey

testified as follows:

>    Q.  It is in bold letters.  Do you see that, Retroactive Date Endorsement?  Do you see that up above on the last page?

>    A.  Yes, Retroactive Date Endorsement.  But what I was saying is, what was that? Let me find that language again.  Prior acts exclusion being attached to the policy. I don't see anything in bold lettering saying prior acts exclusion.

>    Q.  But you would agree with me the language that I just read is a prior acts exclusion; correct?

A.  You would have to ask an insurance expert on that point.  I don't know.

Q.   You hold yourself out to the public as practicing in insurance law, so I'm asking you.

A.  I as an attorney would ask an expert.

Q.   So even though you tell the public that you handle bad faith claims which involves insurance coverage matters, you cannot answer that question?  Is that your testimony?

A.  That's exactly right.  I can't answer that question without an expert telling me whether or not this qualifies as a prior acts exclusion.

Q.  If we get an expert in this case that says this qualifies as a prior acts exclusion, you will withdraw your claim?

      MR. BERLIN:  Objection, hypothetical.

      THE WITNESS:  If our expert told us the same thing, perhaps.  But there might be experts saying something different.  But yeah, if I don't have a claim, I don't have a claim.  I don't want to run anyone up a flag pole.

BY MR. ROCKAS:

Q.  Is it your testimony that if this exclusion on Page 36 of 36 bars coverage for the Knopick claim, then you will withdraw your claim?

A.  Yeah, I will.  That's exactly right.  If that is, in fact the case, I'll withdraw it.

G.    Non-Involvement of John M. Biggio and First Indemnity Insurance Services, Inc.

16.    The communications Downey had regarding the purchase of his First Mercury/State National Insurance policy were with Andrew Biggio of First Indemnity Insurance Agency, Inc., not First Indemnity Insurance Services, Inc.

17.    During the insurance policy procurement process, Downey's conversations regarding coverage under the First Mercury/State National policy were with Andrew Biggio, not John M. Biggio.

6

H.    First Indemnity Insurance and First Indemnity Insurance Group are not Legal Entities

     18.    First Indemnity Insurance and First Indemnity Insurance Group are not legal entities.

I.    First Indemnity's Underwriting Guidelines

     19.    First Indemnity Insurance Agency, Inc.'s Lawyers Professional Liability Underwriting Guidelines that were used to underwrite Downey's policies with First Mercury/State National provide in pertinent part as follows:

PROFILE OF ACCEPTABLE RISKS:

. . . .

1.) Attorneys that do not have coverage will be written with a prior acts exclusion.


II.

LEGAL ARGUMENT

I.    THE PLAIN LANGUAGE OF THE POLICY EXCLUDES COVERAGE FOR CLAIMS ARISING FROM MALPRACTICE COMMITTED PRIOR TO OCTOBER 1, 2007 AND THE REASONABLE EXPECTATIONS DOCTRINE IS INAPPLICABLE.

For all the reasons stated in Defendants First Mercury Insurance Company and State National Insurance Company's Memorandum of Law in Support of Their Motion for Summary Judgment, the plain language of the Policy excludes coverage for claims arising from malpractice committed prior to October 1, 2017 and the reasonable expectations doctrine is inapplicable.   First Mercury and State National's Memorandum of Law is incorporated by reference herein.

7

II.   NO EVIDENCE EXISTS THAT THE ALLEGED CONDUCT OF DEFENDANTS CAUSED PHILIP A. DOWNEY A LOSS

The plaintiff Philip A. Downey in essence claims that he did not know he was purchasing a legal malpractice policy with a retroactive date of 10/01/07 and that he expected to have coverage for wrongful acts he committed before that date and thus for the Knopeck Lawsuit. Implicit in this contention is that if he (Downey) knew of the 10/01/07 retroactive date, he would not have purchased the policy from First Indemnity, but instead he would have gone elsewhere to purchase a policy. This "other" policy would have provided coverage for the Knopick Lawsuit and would have obviated the need for him to personally incur the costs (i.e. attorney fees) associated with defending that lawsuit. It is those costs that Downey is seeking to recover against the First Indemnity Defendants in this case.

This argument fails because there is no evidence in the record that rather than purchasing a policy from First Indemnity Insurance Agency, Inc. with a 10/01/07 retroactive date, he could have gone to another insurance broker and purchased a policy either with no retroactive date or a retroactive date before 10/01/07 that would have provided coverage for the Knopick Lawsuit. Indeed, the only evidence in the record is that the only insurance policy available in the marketplace would have been one with a 10/01/07 retroactive date. Therefore, Downey sustained no damage by the First Indemnity Defendants' alleged actions in selling him a policy with a 10/01/07 retroactive date.

Indeed, the expert opinion of Ty Sagalow establishes that Downey would not have been able to procure a policy that contained no retroactive date or a retroactive date before 10/01/07 that would have provided coverage for the Knopick Lawsuit. Specifically, in his report, Sagalow states as follows:

48.   Having established that (1) retroactive dates are important to both the underwriter and the insured in claims made policies, (2) the October 1, 2007 retroactive date was indeed on the Policy at issue in this case and (3) the fact of the retroactive date was on the Policy was communicated to Mr. Downey several times in several ways, we now reach what might be the essence of Mr. Downey's argument, to wit: that First Indemnity *should have* procured an insurance policy for him with a retroactive date earlier than 10/1/07, such as 7/1/06, the retroactive date on the Philadelphia Policy.

49.   This issue of a "gap" in coverage, allegedly caused by First Indemnity lies at the heart of Mr. Downey's argument. This is stated repeatedly by him:
   a.   "Downey did not know nor did he have reason to suspect that Defendants had *left him with a gap* in coverage between his previous policy with Defendant, John Doe, Philadelphia Insurance company, and his current insurance policy with First Mercury" (Complaint, paragraph 20)(emphasis added)
   b.   "…Downey realized…that Defendants had *failed to procure* adequate legal malpractice coverage for him and, in fact, had *left him with a "gap"* in coverage." (Complaint, paragraph 22) (emphasis added)
   c.   "…First Indemnity…never *searched* for a proper policy for Downey…" (Complaint, paragraph 27)(emphasis added)
   d.   "Andrew (Biggio) assured me that I would have all necessary coverage and would have no gaps." (Affidavit, paragraph 8)

50.   As an initial observation, I have found nothing in the file to support Mr. Downey's version of an oral conversation he allegedly had with Andrew Biggio of First Indemnity in which Mr. Biggio "promised" Mr. Downey that "he would have all the necessary coverage and would have no gaps." However, any such conversation, had it occurred, would be conducted by Mr. Biggio consistent with industry custom and practice and the appropriate industry standard of care.

51.   And so, our analysis of this issue from the point of view of industry custom and practices and the appropriate industry standard of care arises logically and directly from the Continuity Rules set forth in paragraph 30 above.

52.   Two important facts get in the way of Mr. Downey's argument.

53.   First, the Philadelphia Policy had already expired by the time of the September 21, 2007 application. That is to say, the stream of continuity from inception date to expiration date to inception had already been broken. As indicated in his application, which he completed himself, he had no existing insurance policy on the date of the application. Without

9

an existing insurance policy, there was no "continuity" to give.  Under these circumstances, the underwriting guidelines used by State National required a current retroactive date.

54.    <u>HOWEVER, EVEN IF THE PHILADELPHIA POLICY HAD NOT EXPIRED, MR. DOWNEY STILL WOULD HAVE RECEIVED A 10/1/07 RETROACTIVE DATE</u>

55.    The above statement cannot be over emphasized.  The heart of Mr. Downey's argument is that First Indemnity "should have" given me the same coverage as he enjoyed under the Philadelphia Policy.  What he is missing in this argument is that the Philadelphia Policy would not have covered his alleged Wrongful Act in the Underlying Claim either.  Put another way, the "coverage" that the Philadelphia Policy would have afforded for the Wrongful Act alleged in Mr. Knopik's claim would be zero.

56.    LPL policies provide coverage for lawyers acting as "Of Counsel" only for their activities for the firm.  This concept is usually expressed in the definition of "Insured".   In the Philadelphia Policy, definition II, "INSURED", paragraph B states that an Insured shall include:
    B.    any past or present partner, officer, director, stockholder, employee or of counsel of the NAMED INSURED, *but only as respects professional services rendered on behalf of the NAMED INSURED;*

57.    Because the Wrongful Act alleged in Underlying Claim was NOT in the Insured's capacity as Of Counsel to Kenney, Lennon & Egan but rather was made in connection with one of his solo practitioner clients who had nothing to do with Kenney, the Philadelphia Policy is irrelevant.  It is as if it did not exist.

58.    Accordingly, the <u>real lapse</u> in coverage for Wrongful Acts was not the 9 week period between August 18, 2007 and October 1, 2007 but rather the *18 month* period between March 25, 2006 and October 1, 2007.

59.    It is completely unreasonable and against custom and practice to assume that First Indemnity could somehow "fix the lapse" of 18 months not just with State National whose underwriting guidelines prohibited providing prior acts coverage to someone who did not have a current policy but with any insurance carrier in the marketplace.

<u>See</u> Sagalow Report at ¶¶48-59.

10

Based on the Sagalow report, the damages Downey sustained in defending the Knopick Lawsuit (i.e. incurring legal fees) could not have been avoided.  Simply stated, Downey could not have purchased insurance covering the Knopick Lawsuit.

III.  THE DOWNEY CLAIM FAILS BECAUSE HE HAS SUBMITTED NO EXPERT EVIDENCE THAT THE FIRST INDEMNITY DEFENDANTS BREACHED THE STANDARD OF CARE

In Pennsylvania, an insurance agent "is required to exercise the skill and knowledge normally possessed by members of that profession to make sure that the coverage sought by the insured is the coverage received." Pressley v. The Travelers Property Casualty Cas., et al., 2003 PA Super. 58, 817 A. 2d 1131.  Here, Downey in effect is claiming that the First Indemnity Defendants breached the standard of care owed to him by not selling him a policy covering the Knopick Lawsuit.  To establish the duty of care was breached, expert testimony is necessary. See, e.g., River Deck Holding Corp. v. United States Liability Insurance Co., 2004 Phila. Ct. Com. Pl. LEXIS 25 (Pa. C.P. 2004) (Exhibit 1); Federal Kemper Insurance Co. v. Yacomes, 641 F. Supp. 276, 282 (E.D. Pa. 1986) (policyholder must introduce evidence, expert or otherwise, that agent breached the standard of care that might exist in the industry).  The Pennsylvania Supreme Court has held that "expert testimony is necessary to establish negligent practice in any profession." Powell v. Risser, 375 P. 60, 65, 99 A. 2d 454, 456 (1953).  The exception to the rule occurs where "all the primary facts can be accurately described to a jury and if the jury is as capable of comprehending and understanding such facts and drawing correct conclusions from them as are witnesses possessed of special training, experience or observation, then there is no need for the testimony of an expert." Reardon v. Meehan, 424 Pa. 460, 465, 227 A. 2d 667, 670 (1967).  Expert testimony becomes necessary when the subject matter of the inquiry is one

11

involving special skills and training not common to the ordinary layperson. Id. Here, Downey has not designated an expert.

Evaluating the conduct of the First Indemnity Defendants with respect to the sale of the legal malpractice policy to Downey involves special skills and training not common to the ordinary layperson. Therefore, to prove his case, Downey needs to proffer expert testimony, something he cannot do. Here, the expert Ty Sagalow has opined and concluded "[t]hat the Insured, Philip A. Downey, was properly advised by First Indemnity of the Retroactive Date Exclusion" and "that First Indemnity adhered to custom and practice and the appropriate industry standard of care with respect to the Retroactive Date and that First Indemnity could not have reasonably been expected to 'fix the lapse' in coverage of over 18 months between the Covered Wrongful Act date the Insured had on its [sic] last applicable LPL insurance policy and the LPL Policy at issue procured by First Indemnity." Because Downey cannot rebut these opinions through expert testimony, his claims fail, and the First Indemnity Defendants are entitled to summary judgment.

IV.   **DOWNEY HAS STATED ON THE RECORD THAT HE WILL DROP HIS LAWSUIT IF RETROACTIVE DATE ENDORSEMENT BARS COVERAGE**

The Retroactive Date Endorsement provides as follows:

**RETROACTIVE DATE ENDORSEMENT**

This endorsement modifies Insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY COVERAGE PART

In consideration of the premium paid, it is agreed that the policy is amended as follows:

> This policy does not apply to any CLAIMS or CLAIMS arising from, attributable to, or based upon any WRONGFUL ACT(S) committed or alleged to have been committed by the following lawyers prior to the corresponding retroactive date.

12

1115016v.1

## NAME OF ATTORNEY AND RETROACTIVE DATE

Philip A Downey, 10/01/2007

<u>See</u> Wolbert Affidavit at Exhibit E (page 36–36) (Document 45-2).

Downey testified at his March 28, 2015 deposition that if this exclusion bars coverage, he

will drop his claim, testifying as follows:

> Q. It is in bold letters.  Do you see that, Retroactive Date Endorsement?  Do you
> see that up above on the last page?
> A. Yes, Retroactive Date Endorsement.  But what I was saying is, what was that?
> Let me find that language again.  Prior acts exclusion being attached to the policy.
> I don't see anything in bold lettering saying prior acts exclusion.
> Q. But you would agree with me the language that I just read is a prior acts
> exclusion; correct?
> A. You would have to ask an insurance expert on that point.  I don't know.
> Q. You hold yourself out to the public as practicing in insurance law, so I'm
> asking you.
> A. I as an attorney would ask an expert.
> Q. So even though you tell the public that you handle bad faith claims which
> involves insurance coverage matters, you cannot answer that question?  Is that
> your testimony?
> A. That's exactly right.  I can't answer that question without an expert telling me
> whether or not this qualifies as a prior acts exclusion.
> Q. If we get an expert in this case that says this qualifies as a prior acts exclusion,
> you will withdraw your claim?
> MR. BERLIN:  Objection, hypothetical.
> THE WITNESS:  If our expert told us the same thing, perhaps.  But there
> might be experts saying something different.  But yeah, if I don't have a
> claim, I don't have a claim.  I don't want to run anyone up a flag pole.
> BY MR. ROCKAS:
> Q. Is it your testimony that if this exclusion on Page 36 of 36 bars coverage for
> the Knopick claim, then you will withdraw your claim?
> A. Yeah, I will.  That's exactly right.  If that is, in fact, the case, I'll withdraw it.

Downey Deposition, Vol. I, p. 80, Line 13 through p. 82, line 1. (Exhibit A to Statement of

Facts).  Here, the First Indemnity Defendants' expert Ty Sagalow has opined that the exclusion

contained in the Retroactive Date Endorsement bars coverage.  <u>See</u> Sagalow expert opinion at

pages 17-18 (¶¶ 31–34) (Exhibit G).  Moreover, the Court has already ruled that "the plain

language of the policy provides an exclusion for any wrongful acts occurring prior to October 1,

2007.  <u>See</u> Order and Opinion dated December 30, 2014 (Document 64).  Thus, this Court agrees with the expert Sagalow.  More importantly, because the exclusion applies, Downey has stated that he will drop this lawsuit.  In other words, he has admitted his claims against the First Indemnity Defendants have no merit.

V.   <u>DOWNEY HAS NO CLAIMS AGAINST JOHN M. BIGGIO AND FIRST INSURANCE SERVICES, INC. BECAUSE THEY HAD NO INVOLVEMENT WITH DOWNEY AND NO CLAIMS AGAINST FIRST INDEMNITY INSURANCE AND FIRST INDEMNITY INSURANCE GROUP, INC.</u>

The communications Downey had regarding the purchase of his First Mercury/State National insurance policy were with Andrew Biggio (not John M. Biggio) of First Indemnity Insurance, Inc., not First Indemnity Insurance Services.  Moreover, First Indemnity Insurance and First Indemnity Insurance Group are not legal entities.  Therefore, the claims against First Indemnity Insurance Services, Inc., John M. Biggio, First Indemnity Insurance and First Indemnity Insurance Group should be dismissed.

14

III.

CONCLUSION

For all the above reasons, defendants First Indemnity Insurance, First Indemnity Insurance
Agency, First Indemnity Insurance Agency, Inc., First Indemnity Insurance Services, Inc., First
Indemnity Insurance Group, Andrew Biggio and John M. Biggio hereby request that the Court
enter Summary Judgment in their favor and against the plaintiff, Philip A. Downey.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, LLP


/s/ George C. Rockas
George C. Rockas
Admitted Pro Hac Vice
Attorneys for Defendants
First Indemnity Insurance, First Indemnity
Insurance Agency, Inc., First Indemnity Insurance
Services, Inc., First Indemnity Insurance Group,
Andrew Biggio, and John M. Biggio,

260 Franklin Street, 14th Floor
Boston, MA 02110
(617) 422-5300

## CERTIFICATE OF SERVICE

I, George C. Rockas, hereby certify that a true and correct copy of DEFENDANTS
FIRST INDEMNITY INSURANCE, FIRST INDEMNITY INSURANCE AGENCY, INC.,
FIRST INDEMNITY INSURANCE SERVICES, INC., FIRST INDEMNITY INSURANCE
GROUP, ANDREW BIGGIO, and JOHN M. BIGGIO'S MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT was electronically sent by the
Court to all counsel of record.

1115016v.1

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, LLP

/s/ George C. Rockas

George C. Rockas
Admitted Pro Hac Vice
Attorneys for Defendants
First Indemnity Insurance, First Indemnity
Insurance Agency, Inc., First Indemnity Insurance
Services, Inc., First Indemnity Insurance Group,
Andrew Biggio, and John M. Biggio,

260 Franklin Street, 14th Floor
Boston, MA 02110
(617) 422-5300

Dated: October 15, 2015

1115016v.1

EXHIBIT 1



**RIVER DECK HOLDING CORP. a/k/a EDGE CLUB CHEMISTRY, Plaintiff, v. UNITED STATES LIABILITYINSURANCE CO., LANDMARK INSURANCE COMPANY, BOARDMAN HAMILTON COMPANY, ANTHONY CASSELLI, FRANCIS SHEERIN, and AAC OF MANYUNK ASSOCIATES, Defendants.**

**No. 2306, COMMERCE PROGRAM, Control Numbers: 010036, 010162, 010227**

**COMMON PLEAS COURT OF PHILADELPHIA COUNTY, PENNSYLVANIA, CIVIL TRIAL DIVISION**

*2004 Phila. Ct. Com. Pl. LEXIS 25*

**March 23, 2004, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff insured, the operator of a bar-restaurant, commenced an action demanding that defendant insurance companies defend and indemnify the insured under their respective liquor liability policies. In the alternative, the insured asserted a claim against defendant insurance broker for failure to obtain insurance to cover the nature of two customers' claims in their underlying complaints. Defendants filed motions for summary judgment.

**OVERVIEW:** Two customers of the insured's bar-restaurant were assaulted and injured in separate incidents by the insured's employee-bouncers. The court determined that liquor liability policies were intended to cover an insured's liability for wrongful acts under the Dram Shop Act, *47 P.S. §§ 4-493, 4-497*, which did not impose liability on the insured for physical harm to third persons caused by its employee-bouncers unless the employees were visibly intoxicated persons to whom the insured served additional alcohol. The customers' underlying complaints made no mention of alcoholic beverages as a factor in causing their injuries, and the court concluded that their claims were not covered by the policies. The court determined that the insured's claim against the insurance broker failed as a matter of law

because the insured failed to produce an expert report regarding the standard of care for obtaining appropriate insurance for a bar-restaurant. The insurance broker's alleged duty was not an elementary and non-technical transaction that only required simple common sense. In the absence of an expert report, the insured failed to show that the insurance broker deviated from the standard of care.

**OUTCOME:** The court granted defendants' motions for summary judgment and dismissed the insured's claims.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

2004 Phila. Ct. Com. Pl. LEXIS 25, *

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN2] In determining whether to grant summary judgment, a trial court must resolve all doubts against the moving party and examine the record in a light most favorable to the non-moving party. Summary judgment may only be granted in cases where it is clear and free from doubt that the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Insurance Law > Claims & Contracts > Policy Interpretation > Questions of Law*
[HN3] In determining whether there is coverage, a court first looks to the policies at issue. Interpretation of the terms of a insurance contract is a matter of law for the court.

*Insurance Law > Business Insurance > General Overview*
*Insurance Law > General Liability Insurance > Exclusions > General Overview*
*Torts > Negligence > Duty > Alcohol Providers > Dram Shop Statutes*
[HN4] Liquor liability insurance policies are intended to cover an insured's liability for wrongful acts under the Dram Shop Act, *47 P.S. §§ 4-493, 4-497* (Pennsylvania), which liability is often excluded under general commercial liability policies.

*Torts > Negligence > Duty > Alcohol Providers > Dram Shop Statutes*
[HN5] Because Pennsylvania does not recognize common law liability for the service of alcohol to persons who become intoxicated and injure themselves or others, there was no need to insure against such liability until the Dram Shop Act, *47 P.S. §§ 4-493, 4-497* (Pennsylvania) was enacted.

*Torts > Negligence > Duty > Alcohol Providers > Dram Shop Statutes*
[HN6] The Dram Shop Act does not impose liability on a licensee for physical harm to third persons caused by its employee-bouncers, unless the employees were "visibly intoxicated persons" to whom the licensee served additional alcohol. *47 P.S. §§ 4-493, 4-497*

(Pennsylvania).

*Insurance Law > Claims & Contracts > Policy Interpretation > General Overview*
*Insurance Law > General Liability Insurance > Obligations > Defense*
*Torts > Negligence > Duty > Alcohol Providers > Dram Shop Statutes*
[HN7] It has long been the law of the Commonwealth of Pennsylvania that the nature of the allegations contained in an underlying complaint control whether an insurer must defend a policyholder.

*Insurance Law > Claims & Contracts > Good Faith & Fair Dealing > Duty to Defend*
*Insurance Law > Claims & Contracts > Policy Interpretation > General Overview*
*Insurance Law > General Liability Insurance > Obligations > Defense*
[HN8] In determining whether insureds have any potential basis for recovery under a duty to defend, the critical consideration is that the obligation of the insurer to defend an action is fixed solely by the allegations in the underlying complaint.

*Insurance Law > Claims & Contracts > Policy Interpretation > General Overview*
*Insurance Law > General Liability Insurance > Obligations > Defense*
[HN9] If the factual allegations of a complaint state a claim to which a policy potentially applies, the insurer must defend.

*Banking Law > Bank Holding Companies > General Overview*
*Governments > Fiduciary Responsibilities*
*Torts > Malpractice & Professional Liability > Professional Services*
[HN10] In order for a plaintiff to prevail on claims for professional malpractice, the fact-finder must find that the defendant breached its professional duty to the plaintiff.

*Banking Law > Bank Holding Companies > General Overview*
*Insurance Law > Claims & Contracts > Good Faith & Fair Dealing > Agents & Brokers*

*Insurance Law > Industry Regulation > Insurance Company Operations > Representatives > Brokers*

[HN11] An insurance broker's alleged duty, to obtain appropriate insurance for a bar/restaurant is not an elementary and non-technical transaction that requires only simple common sense Whether an insurance broker fails to exercise a reasonable degree of care and skill related to common professional practice in obtaining sufficient insurance is a question of fact outside the normal range of the ordinary experience of laypersons, and an expert report is required to establish duty and breach of duty of the insurance broker. Therefore, an insured's failure to produce an expert witness as to the standard of care under which the insurance broker should have conducted itself and as to any deviation from that standard that may have occurred makes the insured's case defective as a matter of law and justifies its dismissal.

**JUDGES:** [*1]  ALBERT W. SHEPPARD, JR., J.

**OPINION BY:** ALBERT W. SHEPPARD, JR.

**OPINION**

**OPINION**

**Albert W. Sheppard, Jr., J.**

Before the court are Summary Judgment Motions of three defendants, Boardman Hamilton Company ("BHC"), United States Liability Company ("USLIC"), and Landmark Insurance Company ("LIC").

**I. Statement of Facts**

Plaintiff, Riverdeck Holding Corp. ("Riverdeck") operated a bar/restaurant in the Manayunk section of Philadelphia. BHC was the insurance broker for Riverdeck. USLIC and LIC are insurance companies that issued Liquor Liability Insurance Policies to Riverdeck.

The LIC policy covered the period from December 9, 1998, through December 9, 1999, during which time defendant Anthony Casselli was allegedly assaulted and injured by employee-bouncers of Riverdeck. The USLIC policy covered the period from December 9, 1999, through December 9, 2000, during which time defendant Francis Sheerin was allegedly assaulted and injured by employee-bouncers of Riverdeck.

During that time period in which Riverdeck was insured by USLIC and LIC, Riverdeck was also insured under a General Liability Policy issued [*2] by a non-party, Regis Insurance Company ("Regis"). When Casselli and Sheerin filed their separate suits against Riverdeck based on the injuries they allegedly sustained, Regis initially agreed to defend Riverdeck. Subsequently, however, Regis refused to continue defending, and refused to indemnify, Riverdeck because the Regis General Liability Policy contained an exclusion for assault and battery. Based on that exclusion, the Pennsylvania Superior Court found that Regis had no duty to defend or indemnify Riverdeck for the Casselli and Sheerin claims. *See* LIC's Summary Judgment Motion ("SJM"), Ex. H.

In the present action, Riverdeck demands that USLIC and LIC defend and indemnify Riverdeck with respect to the Casselli and Sheerin claims under their respective Liquor Liability Policies. [1] Those policies require USLIC and LIC to defend Riverdeck in suits seeking damages, and to indemnify Riverdeck for any damages Riverdeck becomes obligated to pay,

> because of injury to which this insurance applies if liability for such injury is imposed on the insured by reason of the selling, serving, or furnishing of any alcoholic beverage at or from the insured premises.

USLIC's [*3]  SJM, Ex. F; LIC's SJM, Ex. F.

> 1 Casselli, Sheerin and AAC of Manayunk were also named as defendants because they are parties in the underlying tort actions and are, therefore, interested in the outcome of this action. None of the parties in this action has asserted a claim against any of these defendants.

Riverdeck asserts that Casselli's and Sheerin's claims for injuries are covered by the USLIC and LIC Liquor Liability Policies because they were assaulted by Riverdeck's employee-bouncers after Casselli and Sheerin had been drinking alcoholic beverages at Riverdeck's bar/restaurant. USLIC and LIC have denied coverage for the Casselli and Sheerin claims because the underlying Complaints against Riverdeck make no mention of alcohol as a reason for their injuries. *See* USLIC's SJM, Ex. F.

Case 2:13-cv-04545-MSG   Document 79-1   Filed 10/15/15   Page 21 of 23

Page 4

2004 Phila. Ct. Com. Pl. LEXIS 25, *3

In the alternative, Riverdeck has asserted a claim against BHC for failure to obtain insurance for Riverdeck that would cover the nature of the claims raised by Casselli and Sheerin. BHC responds that it is [*4] not liable to Riverdeck because Riverdeck knowingly underinsured itself. BHC also maintains that it is entitled to summary judgment because Riverdeck failed to produce an expert report regarding the duties of an insurance broker to its bar/restaurant clients.

## II. Legal Analysis.

[HN1] "Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Horne v. Haladay, 1999 PA Super 64, 728 A.2d 954, 955 (Pa. Super. 1999).*

[HN2] In determining whether to grant summary judgment, a trial court must resolve all doubts against the moving party and examine the record in a light most favorable to the non-moving party. Summary judgment may only be granted in cases where it is clear and free from doubt that the moving party is entitled to judgment as a matter of law.

*Id.*

In this case, there is no genuine issue of material fact relative to a determination whether the LIC and USLIC Liquor Liability Policies provide coverage for the Casselli and Sheerin claims. [*5] Furthermore, there are sufficient undisputed facts to determine whether BHC breached its duty to Riverdeck.

**A. LIC's and USLIC's Liquor Liability Policies Do Not Require USLIC and LIC To Defend and Indemnify Riverdeck With Respect to the Underlying Claims.**

[HN3] In determining whether there is coverage here, the court first looks to the policies at issue. Interpretation of the terms of a insurance contract is a matter of law for the court. *See Madison Const. Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 606, 735 A.2d 100, 106 (1999).* [HN4] Liquor liability insurance policies are intended to cover an insured's liability for

wrongful acts under the Dram Shop Act, [2] which liability is often excluded under general commercial liability policies. *See Curbee, Ltd. v. Rhubart, 406 Pa. Super. 505, 511, 594 A.2d 733, 736 (1991)* (as a result of the standard liquor liability exclusion, the general liability policy "did not provide coverage to a licensee for liability arising from providing alcohol for consumption. The insureds evidently understood this exclusion because they procured a separate policy . . . which specifically covered liability [*6] arising from such activity."); *Britamco Underwriters, Inc. v. Logue's Tavern, Inc., 1995 U.S. Dist. LEXIS 17954, 1995 WL 710570 (E.D. Pa. Dec. 1, 1995)* (Liquor Liability Exclusion in a Multi-Peril Policy prohibited insured from recovering from insurer with respect to dram shop claim brought against insured); *State Automobile Ins. Assoc. v. Young Men's Republican Club of Allegheny County, Inc., 663 F. Supp. 1077 (W.D. Pa. 1987)* (Liquor Liability Exclusion "clearly and unambiguously excludes coverage for liability arising from the service of alcohol in violation of" the Dram Shop Act.) [3]

2   *47 P.S. §§ 4-493, 4-497.*
3   [HN5] Because "Pennsylvania does not recognize common law liability for the service of alcohol to persons who become intoxicated and injure themselves or others," there was no need to insure against such liability until the Dram Shop Act was enacted. *See State Automobile Ins. Assoc. v. Young Men's Republican Club of Allegheny County, Inc., 663 F. Supp. 1077, 1079, n. 1 (W.D. Pa. 1987).*

[*7] [HN6] The Dram Shop Act does not impose liability on Riverdeck for physical harm to third persons caused by its employee-bouncers, unless the employees were "visibly intoxicated persons" to whom the licensee served additional alcohol. *See 47 P.S. §§ 4-493, 4-497.* Absent express provisions to the contrary, the court declines to read the USLIC and LIC Liquor Liability Policies expansively to hold that they provide coverage for additional acts not prohibited by the Dram Shop Act.

The question then becomes whether the wrongful acts alleged by Casselli and Sheerin constitute acts proscribed by the Dram Shop Act. In order to answer that question, the court must look to the allegations of their two underlying Complaints. *See Scopel v. Donegal Mutual Ins. Co., 698 A.2d 602, 605 (Pa. Super. 1997)* ([HN7] "it has long been the law of our Commonwealth

Case 2:13-cv-04545-MSG   Document 79-1   Filed 10/15/15   Page 22 of 23

Page 5

2004 Phila. Ct. Com. Pl. LEXIS 25, *7

that the nature of the allegations contained in the [underlying] complaint control whether an insurer must defend a policyholder."); [*8] *Humphreys v. Niagara Fire Ins. Co., 404 Pa. Super. 347, 354, 590 A.2d 1267, 1271 (1991)* ([HN8] "In determining whether [insureds] had any potential basis for recovery under a duty to defend, the critical consideration is that the obligation of the insurer to defend an action is fixed solely by the allegations in the underlying complaint."); *D'Auria v. Zurich Ins. Co., 352 Pa. Super. 231, 234, 507 A.2d 857, 859 (1986)* ([HN9] "If the factual allegations of the complaint . . . state a claim to which the policy potentially applies, the insurer must defend.") If the Casselli and Sheerin Complaints do not set forth any covered causes of action, then USLIC and LIC need not defend nor indemnify Riverdeck. *See Scopel v. Donegal Mutual Ins. Co., 698 A.2d 602, 605 (Pa. Super. 1997).*

Important here, the underlying Complaints in the Casselli and Sheerin actions do not contain Dram Shop Act claims, and make no mention of alcoholic beverages as a factor in causing Casselli's and Sheerin's injuries. *See* LIC's SJM, Ex. G; USLIC's SJM, Ex. E. The initial claims' documents indicate that Casselli and Sheerin may have been inebriated and obstreperous, [*9] which led Riverdeck's employee-bouncers to take an interest in them. *See* BHC's Response to USLIC's SJM, Ex. A, p. 2. However, according to the Complaints, it was the employee-bouncers' alleged intentional acts in striking Casselli and Sheerin (and Riverdeck's negligent hiring, training, and supervision of the employee-bouncers) that was the legal cause of Casselli's and Sheerin's injuries. There are no allegations that Casselli's and Sheerin's injuries were incurred by reason of Riverdeck's selling, serving, or furnishing of any alcoholic beverage. Thus, USLIC and LIC need not defend and indemnify Riverdeck with respect to Casselli's and Sheerin's personal injury actions.

Riverdeck's claims, and BHC's cross-claims, against USLIC and LIC should be dismissed.

**B. Plaintiff Has Failed to Produce the Necessary Expert Report as to the Duties of an Insurance Agent.**

Riverdeck has asserted negligence, breach of contract, and breach of fiduciary duty claims against BHC for failing to recommend and procure appropriate bar/restaurant insurance for Riverdeck. [HN10] In order for Riverdeck to prevail on these claims for professional malpractice, the fact-finder must find that [*10] BHC

breached its professional duty to Riverdeck. *See Storm v. Golden, 371 Pa. Super. 368, 377-8, 538 A.2d 61, 65 (1988).*

The court does not believe that [HN11] BHC's alleged duty, to obtain appropriate insurance for a bar/restaurant,

> is an elementary and non-technical transaction which requires only simple common sense . . . [In this case,] whether [the insurance broker] failed to exercise a reasonable degree of care and skill related to common professional practice in [obtaining sufficient insurance] is a question of fact outside the normal range of the ordinary experience of laypersons.

*Storm v. Golden, 371 Pa. Super. 368, 377, 538 A.2d 61, 65 (1988). See also Himmelreich v. Adams Abstract Assoc., 59 Pa. D. & C.4th 382 (Adams Co. 2002)* (expert report required to establish duty and breach of duty of title insurance agent). Therefore, Riverdeck's "failure to produce an expert witness as to the standard of care under which [BHC] should have conducted itself and as to any deviation from that standard that may have occurred makes [Riverdeck's] case defective as a matter of law," and justifies [*11] its dismissal. *Storm v. Golden, 371 Pa. Super. 368, 378, 538 A.2d 61, 65 (1988). See also Al's Cafe, Inc. v. Sanders Insurance Agency, 2003 PA Super 110, 820 A.2d 745, 752 (Pa. Super. 2003)* (court reversed summary judgment in insurance agent's favor where plaintiff's expert reports raised genuine issue of material fact as to whether agent deviated from "knowledge and skill required of an insurance agent or broker in procuring [liquor liability] insurance coverage for a client.")

In its response to USLIC's and LIC's Motions for Summary Judgment, Riverdeck relies on an expert report procured by BHC, which states:

> It is the opinion of the author that Boardman Hamilton, and its producers, fully conformed to any and all generally accepted standards and practices in the industry, and fully met and exceeded any duties or obligations the agency may have had in its dealings with Riverdeck.

Page 6

2004 Phila. Ct. Com. Pl. LEXIS 25, *11

*See* Plaintiff's Response to USLIC's and LIC's SJMs, Ex. A, p. 12.

Riverdeck has offered no opposition to BHC's Motion for Summary Judgment.

Thus, Riverdeck's claims, and USLIC's and LIC's cross-claims, against BHC should be dismissed.

[*12] **CONCLUSION**

For these reasons, defendants' Motions for Summary Judgment are **granted** and all claims are dismissed. The court will enter a contemporaneous Order consistent with this Opinion.

**BY THE COURT,**

**ALBERT W. SHEPPARD, JR., J.**

**ORDER**

**AND NOW,** this 23rd day of March 2004, upon consideration of the three separate Summary Judgment Motions of defendants, Boardman Hamilton Company, United States Liability Insurance Company, and Landmark Insurance Company, the responses in opposition, the respective memoranda, all other matters of record, and in accord with the contemporaneous Opinion, it is **ORDERED** that the Motions are **GRANTED.** All claims raised in this action are **DISMISSED.**

**BY THE COURT,**

**ALBERT W. SHEPPARD, JR., J.**